## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF NEW YORK

MICHAEL KELLY,

Plaintiff,

-vs-

KEY CORP, and KEYBANK
NATIONAL ASSOCIAITON,

Defendants.

DECISION AND ORDER

23-CV-6569-DGL-MJP

**Pedersen, M.J.** Defendants have moved to compel arbitration and to stay all proceedings in this case. Plaintiff opposes, stating that he never agreed to arbitration, and even if he had, the terms of the agreement with Defendant are unconscionable and should not be enforced. Key Corp and Keybank National Association ("Key") assert that Plaintiff Michael Kelly ("Kelly") could not have applied for a job with Key without having agreed to the arbitration agreement they now move to enforce.

## MAGISTRATE JUDGE JURISDICTION

The Honorable David G. Larimer, U.S. District Judge, referred this case to me on December 19, 2023, "for all pretrial matters excluding dispositive motions." (Text Order Referring Case, ECF No. 10.) A motion to compel arbitration is not dispositive. *See Cumming v. Indep. Health Ass'n, Inc.*, No. 13-CV-969-A(F), 2014 U.S. Dist. LEXIS 96809, at *2 (W.D.N.Y. Jul. 16, 2014). Indeed, the Honorable Richard J. Arcara, U.S. District Judge, determined that the consensus of the cases in this circuit supported this conclusion, because "a decision to compel arbitration does not itself dispose of a case," *id.* at 3, as the Federal Arbitration Act requires a district court's confirmation

of any award. 9 U.S.C. §§ 9–11. Consequently, my decision can be reviewed by the referring district judge if it is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A).

## KEY'S RELIANCE ON HEARSAY

Key described the process of applying for a job with the corporation in an affidavit from Jessika Poldruhi, the Director of Employee Relations and Human Resources Compliance since January 31, 2021. (Poldruhi Aff. ¶ 2, ECF No. 7-1.)

Before I discuss more background information, I need to address Kelly's objection to my consideration of Poldruhi's affidavit because she relied on BrassRing, which Poldruhi described as software that Key uses in job applications. BrassRing is a service of the International Business Machines Corp. ("IBM"), not Key. (Poldruhi Aff. ¶ 3.) Thus, Kelly contends that as a matter of evidentiary rule, Poldruhi's affidavit is not admissible evidence.

Federal Rule of Evidence 803 describes an exception to the rule against hearsay that Key argues applies here:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> (6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
>
>   (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
>   (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
>   (C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). Poldruhi states in her affidavit that:

4. As of May 27, 2015, as part of my duties, I had responsibility for maintenance of employment records, including applicant records retained through BrassRing.  I am familiar with the electronic records applicants were required to complete to be considered for employment with Key.  These records were maintained in BrassRing.

5. Key has continuous access to the electronic records hosted in BrassRing and relies on such records to determine if applicants have completed the required pre-employment records.

6. Key has a substantial interest in the accuracy of these records.

(Poldruhi Aff. ¶¶ 4–6.) Key argues that the records upon which it relies were merely hosted by BrassRing and integrated into Key's records. In *United States v. Jakobetz*, 955 F.2d 786 (2d Cir. 1992), the Second Circuit permitted the admission of records described in Rule 803(6) if a witness testified "that the records are integrated into a company's records and relied upon in its day to day operations." *Id.* at 801 (quoting *Matter of Ollag Constr. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir. 1981)). Even in the situation where the record was originally created by an outside entity, the Court reasoned, the record's "creator need not testify when the document has been incorporated into the business records of the testifying entity." *Id.* (citation omitted).

Poldruhi's affidavit establishes that she is Key's records custodian for employment records, that the employment application records, although created through BrassRing, were created at or near the time the information was transmitted

by the applicant (someone with knowledge of the information), that the records were kept in the regular course of Key's business, and that the creation of the employment applications was a regular practice and, indeed, the only way in which a candidate would be considered for employment with Key.

Kelly has disputed the application by stating in his opposing declaration that he was never presented with an arbitration agreement. (Kelly Decl. ¶ 6, ECF No. 14-2.) However, he does acknowledge that he initiated an application through the BrassRing site in or around February 2015 and uploaded his resumé. (*Id*. ¶ 2.) I determine that Kelly has not shown that the source of information (himself) or the method or circumstances of preparation (through BrassRing) indicate a lack of trustworthiness. The hearsay exception noted above applies here. Accordingly, I will consider Poldruhi's affidavit and attached exhibits.

## THE ARBITRATION CLAUSE

### *Factual assertions.*

Poldruhi states that the first step in applying for a Key job was to join Key's Talent Network. (Poldruhi Aff. ¶ 8.) One way to do that was to visit http://careers.key.com, search for a job, then select "Join our Talent Network" on the top right of the screen. (*Id*. & Ex. B.) "As of May 27, 2015, after joining Key's Talent Network, candidates could not access the Gateway Questionnaire unless they first consented to access, received, reviewed, signed and authenticated certain documents, forms, letters, and other information electronically ('E-Signature Consent')." (*Id*. ¶ 9.) Once an applicant agreed to the electronic signature authentication section, the applicant then proceeded to the Gateway Questionnaire. (*Id*. ¶ 10.) If an applicant

did not click on the "Agree" box on the E-Signature Consent page, he would not proceed any further, and would, instead, receive an error message: "In order to be considered for employment at Key, you must agree to the E-signature Consent." (*Id.* & Ex. C.)

The Gateway Questionnaire page invited the applicant to create a password-protected account by listing the applicant's email address and entering a password that had to meet certain requirements. (Poldruhi Aff. ¶ 11.) Poldruhi states that Kelly "consented to E-Signature, and he logged into the Gateway Questionnaire" on May 27, 2015. (*Id.* ¶ 12.)

Poldruhi provided a sample Gateway Questionnaire. (Poldruhi Aff., Ex. A.) The Gateway Questionnaire that Kelly used on May 27, 2015, hosted on BrassRing, is included as Exhibit D to Poldruhi's affidavit. The exhibit includes Kelly's educational background, prior positions held, and, on page 28 of the exhibit, the following:

> By checking the Agree box below, I acknowledge that I have read the Arbitration Agreement at the above link; have had the opportunity to discuss it with Key or with my own legal counsel; understand its terms; and agree that both Key and I are agreeing to those terms. I also acknowledge that by entering into the Agreement, Key and I are waiving rights to a judicial forum and a jury trial for the determination of any covered claims or disputes; and that if I am an applicant in Oregon, Vermont or Nebraska, I have read, understand, and agreed to tone of the three respective Special Notices below.

(Poldruhi Aff. Ex. D at 28.) Next to the paragraph quoted above is the word, "Agree." Poldruhi states that page five[1] of Exhibit D is evidence that Kelly accepted the

---

[1] Because the screen shots included in Poldruhi's affidavit are not individually numbers, I will rely on the page numbers assigned by the Court's filing system, which appear at the top of each page.

arbitration agreement. (*Id*. ¶ 21 & Ex. D at 28.)

The Gateway Questionnaire contained in Exhibit A of Poldruhi's affidavit shows how a candidate would be guided through the screens starting with the Welcome (asking if the applicant was a current Key employee), moving to the Candidate Provide, Additional Questions, Voluntary Self-ID information, Submit, and Confirmation. (Poldruhi Aff. Ex. A at 1.) At the bottom of each of the screens are buttons allowing the applicant to choose "Close" or "Next." (*Id*.)

During the Additional Questions section is when the applicant is informed of the arbitration agreement, given a link to read the agreement,[2] given a check-box next to the word "Agree," and given the following choices at the bottom of the screen: "Previous, Clear, Close, Save as draft, [or] Next." (Poldruhi Aff.  ¶ 17 & Ex. A at 6.) Without checking the Agree box, a candidate could not proceed further in the application process. (*Id*.)

Once a candidate completed and submitted his application, BrassRing sent him an email acknowledging receipt. A copy of the email Kelly was sent is attached to Poldruhi's affidavit as Exhibit G. Thus, Poldruhi contends that as of May 27, 2015, Kelly had agreed to Key's arbitration agreement.

Kelly contends that around May 27, 2015, he "answered several questions about [himself] and [his] desired employment" using the BrassRing site for Key. (Kelly Decl. ¶¶ 4–6.) He states that at no time during the application process for a

---

[2] Poldruhi's affidavit Exhibit F shows the entire agreement in six screenfuls. Poldruhi also states that one could print out the agreement and review it offline. (Poldruhi Aff. ¶ 18.)

branch manager position at Key was he ever presented with an arbitration agreement, nor did he agree to one. (Kelly Decl. ¶ 9.) He further states that prior to reading Poldruhi's affidavit, he had never seen Exhibits A, B, C, D, E, or F. (*Id.* ¶¶ 12–18.) Regarding Exhibit B, Kelly states, "I believe that I have seen the top half of page 8 Exhibit B, asking if I am a 'current Key employee,' presented without the bottom half of Exhibit B (mentioning arbitration)." (Kelly Decl. ¶ 14.)

Kelly conducted a search of his email system and did not find any emails from Key or BrassRing "containing notice of the allegation that I had signed an arbitration agreement nor agreed to arbitration." (Kelly Decl. ¶ 21.)

***The facts asserted by Kelly do not raise a triable issue of fact.***

When assessing whether parties have agreed to arbitration, the Court must employ "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citations omitted). In New York, "[w]here there is no substantial question whether a valid agreement was made or complied with … the court shall direct the parties to arbitrate." *Liberty Mgmt. & Const., Ltd. v. Fifth Ave. & Sixty-Sixth St. Corp.*, 208 A.D.2d 73, 77 (1st Dep't 1995) (quoting C.P.L.R. 7503(a)). Kelly disputes that he agreed to arbitration and cites *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45 (2d Cir. 2022), in support of his contention that his denial is sufficient to create a triable issue of fact.

As with summary judgment, if a triable issue of fact is raised by the opposition, then the Court cannot assume that the arbitration agreement exists and is binding. In determining whether the agreement exists, the Court must consider all relevant, admissible evidence submitted by the parties and contained in the pleadings.

7

*Barrows*, 36 F.4th at 50.

In *Barrows*, the Second Circuit held that the party seeking enforcement of an arbitration agreement must initially demonstrate that an agreement to arbitrate was made and exists. *See id.* at 50. Production of an arbitration agreement bearing the claimant's electronic signature was sufficient to meet this burden in *Barrows*. After that, the burden shifts to the person opposing arbitration "to counter with at least '*some evidence* … to substantiate [her] denial' that an agreement had been made." *Id.* (quoting *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972)) (emphasis in original). "Where a party merely states that she cannot *recall* signing an agreement (as opposed to *denying* she has done so), such a declaration ordinarily fails to create a triable issue of fact." *Id.* at 51. In *Barrows*, the Second Circuit found that in her affidavit, Barrows,

> categorically denied ever completing any electronic paperwork for either PDI or for Brinker; using any of her employer's computers at her workplace; receiving or signing any documents showing receipt of Brinker's arbitration policies; using the Taleo system; hearing about or having any knowledge of the Taleo system; or, while employed by Brinker, owning, or even living in a home with, any computer whatsoever. This detailed accounting, submitted under oath, is surely "some evidence" that she did not agree to arbitration.

*Id.* at 51–52.

Unlike the affidavit in *Barrows*, Kelly's declaration *admits* use of the BrassRing and Key application systems on his computer to apply for a position of branch manager. (Kelly Decl. ¶¶ 3–5, 10.) His denials, unlike those of Barrows, are of the type prefaced with "according to my best recollection." (*Id.* ¶¶ 12, 13, 15, 16, 17, 18.) In *Barrows*, the allegation by the employer was that Barrows set up an account

using the employer's computer during working hours, and the Court noted that "the fact that the signature came from a device that Brinker owned and possessed (rather than, say, Barrows's home computer), might also lead one to infer that Brinker's agents, and not Barrows, were the ones who signed the documents (an inference which, at this motion-to-compel stage, we must draw)." *Barrows*, 36 F.4th at 52–53. No such evidence of potential fraud exists here.

Instead, Key's evidence shows conclusively that Kelly must have agreed to the arbitration clause to have completed his application, and that he did complete and submit his application to Key. His lack of recollection does not refute the carefully explained process for applying for a Key position, which required acceptance of the arbitration agreement prior to being *able* to submit the application to Key. I conclude that Kelly has not created a triable issue of fact as to whether the arbitration agreement exists, and whether he agreed to it.

### Is the arbitration agreement enforceable?

"The question of whether a certain or undisputed state of facts establishes a contract is one of law for the courts." *Resetarits Const. Corp. v. Olmsted,* 118 A.D.3d 1454, 1455 (4th Dep't 2014) (cleaned up and quotation omitted). "To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound (22 N.Y. Jur. 2d, Contracts § 9). That meeting of the minds must include agreement on all essential terms." *Id.* (citation omitted). Here, Key was offering a position on the condition of accepting an agreement to arbitrate disputes. Kelly manifested his acceptance of that offer, and his intent to be bound by it through checking the "Agree" box and

submitting his application to Key. "Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (citation omitted). Because this transaction took place in the Twenty-First Century, where paper is becoming more and more scarce, the proof is in the electronic records submitted by Key's agent. That Kelly never put pen to paper to document his acceptance of the arbitration agreement is of no matter. In New York, an electronic signature carries the same validity as a pen and ink signature. *See, e.g., Knight v. New York & Presbyt. Hosp.*, 219 A.D.3d 75, 80 (1st Dep't 2023); N.Y. State Tech. Law § 304 (Consol., Lexis Advance through 2024 released Chapters 1-49, 61-90).

The consideration was the employment opportunity. "While *past* employment is inadequate consideration to establish a contract, however, *continued* or *future* employment is sufficient to do so." *Brevard v. Suisse*, No. 23-cv-428 (LJL), 2024 U.S. Dist. LEXIS 2231, at \*14 (S.D.N.Y. Jan. 3, 2024) (citations omitted and emphasis in original).

Kelly also argues that he "never submitted an application for a Branch Manager position in association with this promotion, never utilized the BrassRing system, never was asked to agree to an arbitration agreement, and certainly never actually agreed to an arbitration agreement in association with being promoted to the Branch Manager position in June 2017, two years later." (Kelly Mem. of Law at 4, ECF No. 14-1.) The arbitration agreement to which Kelly agreed in 2015 did not contain an expiration date. (Poldruhi Aff., Ex. F.) The agreement specifically states

10

that it survives Kelly's termination of employment with Key, or Key's termination of business. (*Id.*) I conclude that it is still in effect.

***Federal Arbitration Act.***

The Federal Arbitration Act ("FAA") requires the Court to enforce valid arbitration agreements. 9 U.S.C. § 2 (2022). Arbitration agreements in the employment context are also covered by the FAA. *Circuit City Stores v. Adams*, 532 U.S. 105, 119 (2001). The FAA permits a party to bring an action compelling arbitration. 9 U.S.C. § 4. That section "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). This reflects the fact that:

> The FAA is an expression of a strong federal policy favoring arbitration as an alternative means of dispute resolution. In fact, this Court has said that it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied.

*Ragone v. Atl. Video*, 595 F.3d 115, 121 (2d Cir. 2010) (cleaned up).

Kelly argues that the arbitration agreement is "an unconscionable contract of adhesion," and should not be enforced. (Kelly Mem. of Law at 1 & 15, ECF No. 14-1.) "An unconscionable contract has been defined as one which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988) (cleaned up).

> A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made–*i.e.*, some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are

11

unreasonably favorable to the other party.

*Id.* (cleaned up).

Procedurally, the parties entered into the arbitration agreement through Kelly's clicking on an "Accept" box and submitting his application through BrassRing. As the Poldruhi affidavit demonstrates, the arbitration agreement was available for reading, downloading, and printing. Further, Kelly could not have proceeded to submit his application to Key without checking the "Accept" box to show acceptance of the arbitration agreement. Substantively, that Key dictated the terms is not unconscionable. "[I]t is well accepted under New York law that it is not unconscionable to be bound by an arbitration agreement in the course of securing employment." *Isaacs v. OCE Bus. Servs.*, 968 F. Supp. 2d 564, 570 (S.D.N.Y. 2013); *see also Ragone v. Atl. Video*, 595 F.3d 115, 121 (2d Cir. 2010) ("[T]he FAA certainly does not preclude the enforcement of employment contracts which make employment conditional upon an employee's acceptance of mandatory arbitration.") (citation omitted). Although Kelly makes the point that he started his job search process on BrassRing in February 2015, all of Key's references are to May 27, 2015. Key responded in its Reply memorandum that the February date,

> is of no consequence as it is not connected to the Arb. Agreement acknowledgement in Ex. D on page 5 nor is it connected to any other part of the Poldruhi Affidavit. Instead, the date is only connected to the Voluntary Self-ID Information Form contained on page 6[3] of Ex. D. Additionally, Plaintiff admits in his own Declaration that "In or around February of 2015" he was "using the employment recruitment site, BrassRing" and that "around the same time, he created an account on

---

[3] The Court's filing system labeled this as page 29 of ECF No. 7-1.

BrassRing." (Pl's Dec. at ¶¶ 2-3).

(Key Reply Mem. of Law at 3 n.2, ECF No. 17.) Exhibit D shows that Kelly completed the voluntary self-ID portion of the BrassRing process on February 21, 2015, and then submitted his application to Key on May 27, 2015. (Poldruhi Aff., Ex. D at 29–30.) The full arbitration agreement was available to Kelly, and he was required to accept it to move on in the Key application process. *See Lewis v. ANSYS, Inc.*, No. 19-CV-10427 (AJN), 2021 WL 1199072, at *5 (S.D.N.Y. Mar. 30, 2021) ("[I]f a party signs or 'otherwise assents' to an agreement with an arbitration provision, they will be bound by it even if they did not read it.") (cleaned up). An arbitration agreement is not unconscionable under New York law if it is "clear, explicit and unequivocal and [does] not depend upon implication or subtlety." *Id.* (alteration added). The arbitration agreement here is clear, explicit, and unequivocal. (Poldruhi Aff., Ex. F.) It binds both Key and Kelly, uses the rules of the American Arbitration Association, and permits either Key or Kelly to request arbitration of a dispute. My research turned up no cases in the federal courts, or New York courts, holding that an arbitration agreement with a provision permitting an employer to amend it with notice to the employee was unconscionable. *See, e.g.*, *Serpa v. California Sur. Investigations, Inc.*, 215 Cal. App. 4th 695, 706, 155 Cal. Rptr. 3d 506, 514 (2013), *as modified* (Apr. 19, 2013), *as modified* (Apr. 26, 2013) (arbitration agreement that could be modified by the employer not unconscionable). Thus, the agreement here is not unenforceable as unconscionable.

### *Kelly's fraudulent inducement argument is unpersuasive.*

Kelly argues that his initial application to Key was prompted by Key's

advertising a branch manager position, but when he was offered an interview, he learned from Key that the branch manager position advertised did not actually exist at that time. Key informed Kelly that it would consider him for a Hire Ahead Personal Banker position:

> Nicole Berg ("Ms. Berg"), the Recruiter for Defendants, contacted me and told me that the posting on BrassRing was an "evergreen posting" and there was no actual Branch Manager position available at that time. Ms. Berg made clear that the Defendants had kept the Branch Manager posting active despite the fact that there was no actual Branch Manager position available because they liked to collect resumes.

(Kelly Decl. ¶ 23, 27.) About two years later, Kelly was promoted to branch manager. (*Id.* ¶ 33.)

Although Key's website implied a branch manager position was available, Key clarified that it was not. Kelly was not fraudulently induced to accept the personal banker position, but he did accept it, and had already agreed to be bound by the arbitration agreement in his initial application to Key.

## CONCLUSION

Key has shown the existence of a valid arbitration agreement to which Kelly assented during his initial application process completed through BrassRing and Key's Gateway Application. The agreement covers the dispute between them and is not unconscionable. Accordingly, the Court orders the parties to submit to arbitration per the agreement and stays the present case until Wednesday, June 26, 2024. In the event this case is not resolved through arbitration by that date, the stay will be automatically lifted, and the Court will hold a case management conference at 10:00 a.m. on June 26, 2024. Any request to adjourn the date of the conference must be

made prior to June 26, 2024, and provide good cause. Fed. R. Civ. P. 6(b).

**SO ORDERED.**

DATED:       March 15, 2024
             Rochester, New York

 

_____
MARK W. PEDERSEN
United States Magistrate Judge